Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Michael R. Lozeau (State Bar No. 142893)
Richard T. Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA COMMUNITIES
AGAINST TOXICS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, an unincorporated non-profit association, <br><br> Plaintiff, <br><br> vs. <br><br> MARCHEM TECHNOLOGIES, LLC, a limited liability company, DOES 1 through 10, <br><br> Defendants. | Case No. 2:14-cv-2562 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

1

CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT"), a California non-profit association, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On January 31, 2014, Plaintiff provided notice of Defendants' violations of the Act, and of its intention to file suit against Defendants, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant MARCHEM TECHNOLOGIES, LLC, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CCAT's notice letter is attached as Exhibit

A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on MARCHEM TECHNOLOGIES, LLC and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.      This complaint seeks relief for discharges of storm water and non-storm water pollutants from Defendant MARCHEM TECHNOLOGIES, LLC's ("MT" or "Defendant") chemical manufacturing facility located at 20851 S. Santa Fe Ave., Carson, California ("the Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's failure to comply with

1   the discharge, treatment technology, monitoring requirements, and other procedural

2   and substantive requirements of the Permit and the Act are ongoing and continuous.

### III.   PARTIES

6.     Plaintiff CALIFORNIA COMMUNITIES AGAINST TOXICS

("CCAT") is an unincorporated non-profit association under the laws of the State of

California with its main office in Rosamond, California.  CCAT has several members

who live, recreate and work in and around waters in the vicinity of MT's Facility.

CCAT is dedicated to the preservation, protection, and defense of the environment,

particularly with respect to areas and waters near urban industrial communities.  To

further these goals, CCAT actively seeks federal and state agency implementation of

the Act and other laws and, where necessary, directly initiates enforcement actions on

behalf of itself and its members.

7.     Members of CCAT reside in and around the Facility and the Dominguez

Watershed and enjoy using the Dominguez Watershed for recreation and other

activities.  Members of CCAT use and enjoy the waters into which the Facility has

caused, is causing, and will continue to cause, pollutants to be discharged.  Members

of CCAT use those areas to recreate and view wildlife, among other things.  The

Facility's discharges of pollutants threaten or impair each of those uses or contribute

to such threats and impairments.  Thus, the interests of CCAT's members have been,

are being, and will continue to be adversely affected by Defendants' failure to comply

with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by these activities.

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Plaintiff alleges on information and belief that Defendant MARCHEM TECHOLOGIES LLC, or MT, is a Delaware limited liability company that operates the Facility in Carson, California.

10.     Upon information and belief, and upon that basis, PLAINTIFF alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to PLAINTIFF, who therefore sue said Defendants by such fictitious names. PLAINTIFF will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not MT is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by PLAINTIFF.

11.     MT and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendants.

## IV.   **STATUTORY BACKGROUND**

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of

any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

13.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

14.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

15.    The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and

complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

17.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply

("NOI").  The General Permit requires existing dischargers to have filed their NOIs

before March 30, 1992.

19.     Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities

and measures that comply with the BAT and BCT standards.  The General Permit

requires that an initial SWPPP have been developed and implemented before October

1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources

of pollutants associated with industrial activities that may affect the quality of storm

and non-storm water discharges from the facility and identify and implement site-

specific best management practices ("BMPs") to reduce or prevent pollutants

associated with industrial activities in storm water and authorized non-storm water

discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT

(Section B(3)).  The SWPPP must include: a description of individuals and their

responsibilities for developing and implementing the SWPPP (Section A(3)); a site

map showing the facility boundaries, storm water drainage areas with flow pattern and

nearby water bodies, the location of the storm water collection, conveyance and

discharge system, structural control measures, impervious areas, areas of actual and

potential pollutant contact, and areas of industrial activity (Section A(4)); a list of

significant materials handled and stored at the site (Section A(5)); a description of

potential pollutant sources including industrial processes, material handling and

COMPLAINT

8

storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Sections A(9), (10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board. *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992. Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section

B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample...facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

23.     The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described.  This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area."  Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that best management practices ("BMPs") are included in the Storm Water Pollution Prevention Plan to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are

effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain records of such observations.

24.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

25.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

26.     The Regional Board has established water quality standards for the Los Angeles River Watershed in the "Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties", generally referred to as the Basin Plan.

27.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are

COMPLAINT                                                           12

toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

28.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

29.     The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

30.     The Basin Plan provides that "[t]he pH of bays or estuaries [or inland surface waters] shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges."

31.     The Basin Plan incorporates a Maximum Contaminant Level (hereinafter "MCL") for aluminum of 1 mg/L and for nitrate + nitrite (sum as nitrogen) ("N+N") of 10 mg/L.

32.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

33.     The Basin Plan provides that "[w]ater shall not contain floating materials,

including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

34.   The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

35.   EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  EPA has established Parameter Benchmark Values for the following parameters, among others: pH – 6.0 - 9.0 units; total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; total organic carbon ("TOC") – 110 mg/L; total aluminum – 0.75 mg/L; total iron – 1.0 mg/L; total zinc – 0.13 mg/L; and N + N – 0.68 mg/L.

36.   EPA has promulgated the California Toxics Rule (hereinafter "CTR"), establishing freshwater numeric water quality standards known as Criteria Maximum Concentration (hereinafter "CMC") and Criteria Continuous Concentration (hereinafter "CCC") for zinc of 0.120 mg/L (CMC and CCC).  40 C.F.R. § 131.38.

37.   Moreover, EPA has promulgated an additional freshwater numeric water quality standards, known as Total Maximum Daily Loads (hereinafter "TMDL") for the Dominguez Channel for metals including zinc. *See* http://63.199.216.6/larwqcb_new/bpa/docs/R11-008/R11-008_RB_BPA.pdf.

38.   Section 505(a)(1) and Section 505(f) of the Act provide for citizen

enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    **STATEMENT OF FACTS**

39.    MT operates the Facility at 20851 S. Santa Fe Ave. in Carson, California. On information and belief, CCAT alleges that the Facility is engaged in chemical manufacturing. The Facility falls within SIC Codes 2843 and 2844. The Facility consists of a warehouse, raw material storage area, processing and operations area, and a contained rail unloading area. The majority of the Facility exterior is paved and used for receiving, storing, processing, and transporting chemicals.

40.    MT channels and collects storm water from its industrial site into at least three storm water outfalls located at the Facility. The storm water discharged to those outfalls is then discharged to the County of Los Angeles storm drain system into channels that flow into Bl 1203 – Line A and/or Bl 0541 – Line A – Lincoln Village, which are then discharged to the Dominguez Channel, which flows into the East Basin

COMPLAINT

of the Los Angeles Harbor.

41.     On information and belief, Plaintiff alleges that the industrial activities at the site include producing high performance specialty chemicals for industrial and intermediate uses. Within the oil and gas industry, MT's product lines are used extensively in drilling, pipeline and production. MT's line of surfactants, emulsifiers, corrosion inhibitors, foamers, specialty alkoxylates and urethanes are also used widely in agriculture, industrial foams and coatings, emulsion breakers, non-emulsifiers, and HI&I (household, institutional and industrial).

42.     The management practices at the Facility do not prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

43.     Since at least April 2, 2009, MT has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board.  MT certified each of those annual reports pursuant to Sections A and C of the General Permit.

44.     Since at least April 3, 2009, the Facility has detected pH, TSS, oil & grease, zinc, and N+N in storm water discharged from the Facility. Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  Levels of these pollutants detected in MT's

COMPLAINT

16

storm water have been outside of the parameters for water quality standards and in violation of the narrative water quality standards established in the Basin Plan.

45.   The following discharges on the following dates contained concentrations of pollutants in excess of the numeric water quality standards or narrative water quality standards established in the Basin Plan and the California Toxics Rule:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective/EPA California Toxics Rule | Location (as identified by the Facility) |
|---|---|---|---|---|
| 5/6/2013 | Zinc | 1.1 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
| 10/11/2012 | Zinc | 1.3 mg/L | 0.12 mg/L CMC/ CCC | Area 1 SD #1 front driveway |
| 10/11/2012 | Zinc | 0.98 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
| 4/13/2012 | Zinc | 0.43 mg/L | 0.12 mg/L CMC/CCC | Area 1 SD #1 front driveway |
| 4/13/2012 | Zinc | 0.43 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
| 1/23/2012 | Zinc | 0.36 mg/L | 0.12 mg/L CMC/CCC | Area 1 SD #1 front driveway |

| 1/23/2012 | Zinc | 1.0 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
|---|---|---|---|---|
| 2/18/2011 | Zinc | 2.2 mg/L | 0.12 mg/L CMC/CCC | Area 1 SD #1 front driveway |
| 2/18/2011 | Zinc | 3.7 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
| 10/6/2010 | Zinc | 0.91 mg/L | 0.12 mg/L CMC/ CCC | Area 1 SD #1 front driveway |
| 10/6/2010 | Zinc | 2.9 mg/L | 0.12 mg/L CMC/ CCC | Area 2 SD #2 rear warehouse ramp |
| 12/9/2009 | Zinc | 0.33 mg/L | 0.12 mg/L CMC/ CCC | Area 1 SD #1 front driveway |
| 12/9/2009 | Zinc | 0.21 mg/L | 0.12 mg/L CMC/CCC | Area 2 SD #2 rear warehouse ramp |
| 10/14/2009 | Zinc | 0.15 mg/L | 0.12 mg/L CMC/ CCC | Area 1 SD #1 front driveway |
| 10/11/2012 | pH | 8.7 | 6.5 – 8.5 | Area 2 SD#2 rear warehouse ramp |

The information in the above table reflects data gathered from MT's self-monitoring during the 2009-2010, 2010-2011, 2011-2012, 2012-2013 wet seasons.

COMPLAINT

46.     Discharges on the following dates from the Facility contained concentrations of pollutants in excess of the numeric EPA water quality benchmarks: May 6, 2013, October 11, 2012, April 13, 2012, January 23, 2012, February 18, 2011, October 6, 2010, December 9, 2009, and October 14, 2009 for TSS, N+N, zinc, and oil & grease. The information reflects data gathered from MT's self-monitoring during the 2009-2010, 2010-2011, 2011-2012, and 2012-2013 wet seasons.

47.     The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.

48.     The level of N+N in storm water detected by the Facility has exceeded the benchmark value of 0.68 mg/L established by EPA.

49.     The benchmark values of some metals (ie. cadmium, copper, lead, nickel, silver, and zinc) are dependent on water hardness. For these parameters, permittees must determine the hardness of the receiving water (*see* Appendix J, "Calculating Hardness in Receiving Waters for Hardness Dependent Metals," for methodology), in accordance with Part 6.2.1.1, to identify the applicable 'hardness range' for determining their benchmark value applicable to their facility.

50.     The level of zinc, a hardness dependent metal, in storm water detected by the Facility has exceeded the CTR standard of 0.12 mg/L, and the benchmark value of between 0.04-0.26 mg/L, established by EPA.

51.     The level of oil & grease in storm water detected by the Facility has

COMPLAINT                                    19

exceeded the benchmark value of 15.0 mg/L established by EPA.

52.     Many of these violations at the Facility are orders of magnitude above the EPA benchmark values and CTR standards.

53.     On information and belief, Plaintiff alleges that MT did not conduct required visual observations during the 2009–2010, 2010-2011, 2011-2012, and 2012-2013 wet seasons.  MT failed to conduct monthly visual observations of all storm water discharge locations at the Facility during the following months of the indicated years: October and December of 2009; February, March, April, May, November, and December of 2010; January, March, April, May, October, November, and December of 2011; January, February, March, November, December of 2012; and January, February, March, April of 2013.

54.     On information and belief, Plaintiff alleges that MT failed to sample all of its storm water outfalls on April 13, 2012.  The sampling results for the SD #1 and the SD #2 outfalls were exactly the same results for every parameter and thus do not appear to be distinct samples.

55.     On information and belief, Plaintiff alleges that since at least April 3, 2009, Defendants have not implemented BAT and BCT at the Facility for discharges of TSS, N+N, zinc, and oil & grease, suspended materials, discoloration, floating materials and other pollutants.  Section B(3) of the General Permit requires that Defendants implement BAT for toxic and nonconventional pollutants and BCT for

conventional pollutants by no later than October 1, 1992.  As of the date of this

Complaint, the Facility has not implemented BAT and BCT.

56.     On information and belief, Plaintiff alleges that since at least April 3,

2009, MT did not implement an adequate Storm Water Pollution Prevention Plan for

the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP

prepared for the Facility does not set forth site-specific best management practices for

the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed

and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not

include an adequate assessment of potential pollutant sources, structural pollutant

control measures employed by MT, a list of actual and potential areas of pollutant

contact, or an adequate description of best management practices to be implemented

at the Facility to reduce pollutant discharges.  Plaintiff is informed and believes, and

thereupon alleges, that the SWPPP does not include each of the mandatory elements

required by Section A of the General Permit.

57.     Information available to CCAT indicates that as a result of these

practices, storm water containing excessive pollutants is being discharged during rain

events from the Facility directly to the County of Los Angeles storm drain system,

which discharges to the Dominguez Channel.

58.     Plaintiff is informed and believes that Defendants did not submit to the

Regional Board, since at least April 3, 2009, an annual report, that is signed and

certified by the appropriate corporate officer, outlining the Facility's storm water controls and accurately certifying compliance with the General Permit Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit.

59.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

60.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

61.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendants have not implemented BAT and BCT at the Facility for discharges of TSS, N+N, zinc, oil & grease, suspended materials, discoloration, floating materials and other pollutants in violation of Effluent Limitation B(3) of the General Permit.

62.    Each day, since April 3, 2009, that Defendants did not develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

63.    Defendants have not complied with the BAT/BCT requirements every day since April 3, 2009.  Defendants continue to not comply with the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

64.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

65.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

66.    Plaintiff is informed and believes, and thereupon alleges, that since at least

COMPLAINT

23

April 3, 2009, Defendants have discharged polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

67.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

68.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

69.     Every day, since at least April 3, 2009, that Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

70.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

71.     Section A and Provision E of the General Permit requires dischargers of

COMPLAINT

24

storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

72.     Defendants have not developed and implemented an adequate SWPPP for the Facility.

73.     Each day since April 3, 2009, that Defendants do not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

74.     Defendants have been in violation of the SWPPP requirements every day since April 3, 2009.  Violation continues each day that an adequate SWPPP for the Facility is not developed and fully implemented.

## FOURTH CAUSE OF ACTION
### Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

75.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

76.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

77.     Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility.  Defendants' ongoing lack of an adequate

monitoring and reporting program is evidenced by, *inter alia*, the Facility's failure to sample all of its storm water outfalls on April 43, 2012, as well as, the failure to conduct monthly visual observations during the 2009–2010, 2010-2011, 2011-2012, and 2012-2013 wet seasons.

78.     Each day since April 3, 2009, that Defendants did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous.

**FIFTH CAUSE OF ACTION**
**Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

79.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

80.     Defendants have not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least April 3, 2009.

81.     Each day since at least April 3, 2009, that Defendants do not accurately compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants continue to be in violation of the General Permit's certification requirement each day they maintain an

inaccurate certification of its compliance with the General Permit.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a. Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b. Enjoin Defendants from discharging polluted storm water from the Facility unless authorized by the Permit;

c. Enjoin Defendants from further violating the substantive and procedural requirements of the Permit;

d. Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e. Order Defendants to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f. Order Defendants to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g. Order Defendants to provide Plaintiff with reports documenting the

quality and quantity of their discharges to waters of the United States and their efforts

to comply with the Act and the Court's orders;

      h.  Order Defendants to pay civil penalties of $37,500 per day per

violation for all violations pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C.

§§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

      i.   Order Defendants to take appropriate actions to restore the quality of

waters impaired or adversely affected by their activities;

      j.  Award Plaintiff's costs (including reasonable investigative, attorney,

witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

§ 1365(d); and,

      k.  Award any such other and further relief, as this Court may deem

appropriate.

Dated: _____4/3_____, 2014        Respectfully submitted,

                                     By:  _____

                                         Gideon Kracov
                                         Attorneys for Plaintiff

                                         CALIFORNIA COMMUNITIES AGAINST
                                       TOXICS